AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

### DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

**V.**

SEKOU SILLAH, a/k/a SEKOU SYLLA
50 Hartford Street, Apt. 2
Dorchester, MA

(Name and Address of Defendant)

## CRIMINAL COMPLAINT

CASE NUMBER: 04-M00074-LPC

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about  From  Aug. 18, 2003 - Sept. 27, 2004  in  Suffolk  county, in the

District of  Massachusetts  defendant(s) did, (Track Statutory Language of Offense)

infringe copyrights willfully, either for purposes of commercial advantage or private financial gain, or did reproduce or distribute, including by electronic means, during any 180-day period, at least 10 copies or phonorecords, of 1 or more copyrighted works, which have a total retail value of more than $2,500; and did intentionally traffic or attempt to traffic in goods or services and knowingly used a counterfeit mark on or in connection with such goods or services; and did knowingly conduct, control, manage, supervise, direct, or own all or part of an unlicensed money transmitting business

in violation of Title  18  United States Code, Section(s)  2319, 2320 and 1960  .

I further state that I am a(n)  Senior Special Agent, Immigration and Customs Enforcement  and that this complaint is based on the following

Official Title

facts:

See attached affidavit.

Continued on the attached sheet and made a part hereof:  ☒ Yes  ☐ No

Signature of Complainant

REBECCA S. FALLON

Sworn to before me and subscribed in my presence,

10-29-2004

Date

at  PEABODY  Boston, Massachusetts

City and State

LAWRENCE P. COHEN
United States Magistrate Judge

Name & Title of Judicial Officer

Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

**AFFIDAVIT**

I, Rebecca S. Fallon, being duly sworn, hereby depose and state as follows:

1.    I am a Senior Special Agent with the Department of Homeland Security, Immigration and Customs Enforcement, Boston, Massachusetts and have been so designated since March 1, 2003. From April, 1992 to March 1, 2003, I was a Special Agent with the United States Customs Service, Boston, Massachusetts.  I have been a Special Agent with the United States Customs Service or with the Department of Homeland Security and Immigration and Customs Enforcement for approximately 12 years.  My duties as an Agent with the Department of Homeland Security and with the United State Customs Service include investigating violations of federal law, including those involving the laundering of monetary instruments.  I have received specialized training in the investigation of that crime.

2.    I am submitting this affidavit in support of an application for a criminal complaint and arrest warrant for an individual named Sekou Sillah, and a search warrant for apartment number two (2) located at 50 Hartford Street in Dorchester, Massachusetts, as described with more specificity in the section below entitled "Premises to be Searched."

3.    I have been actively involved in the investigation of Sekou Sillah and other persons and entities, known and unknown

1

(hereinafter the "Subjects"), and I am familiar with results of this investigation to date. Unless otherwise indicated, the information contained herein has been obtained by me during the course of my investigation, or has been communicated to me by other law enforcement agents and intelligence analysts assisting me with the investigation. In submitting this affidavit, however, I have not included each and every fact known to me about the investigation, but only those facts that I believe are sufficient to support this application for a criminal complaint, arrest warrant, and search warrant.

## PREMISES TO BE SEARCHED

4. The premises to be searched (hereinafter "the apartment") is described as follows: An apartment unit identified as Apartment 2 within a two family, residential structure, parcel identification number 1300978000, located at 50 Hartford Street, Dorchester, Massachusetts 02125. This residential structure is white in color with asphalt roofing. A small porch is located on the left front side of the structure supported by columns, which are maroon in color. The center column has the number "50" affixed to same. Just to the right side of the door leading into the left apartment there is located a number "2," while just to the right side of the door leading into the right apartment there is located a number "1." In addition, a porch light is located above each door, two mailboxes are affixed between these doors,

2

and there is a chain link fence with a gate that borders the front perimeter of the property.

5.    As explained in this affidavit, I believe that there is probable cause to believe that evidence exists at the apartment for violations of Title 18, United States Code, § 2319 (Criminal Infringement of Copyright), § 2320 (Trafficking in Counterfeit Goods or Services) and § 1960 (Operation of an Unlicensed Money Transmitting Business).  Through this warrant, I seek permission to seize evidence, documents and records, including computers and components, as described with more particularity in the section below entitled "Items to be Seized."

### TRAFFICKING IN COUNTERFEIT GOODS OR SERVICES

6.    Title 18, United States Code, § 2319 states as follows:

> any person who commits an offense under § 506(a)(1) of Title 17 shall be imprisoned not more than 5 years, or fined in the amount set forth in this title, or both, if the offense consists of the reproduction or distribution, including by electronic means, during any 180-day period, of at least 10 copies or phonorecords, of 1 or more copyrighted works, which have a total retail value of more than $2,500;

> shall be imprisoned not more than 10 years, or fined in the amount set forth in this title, or both, if the offense is a second or subsequent offense under paragraph (1);

> shall be imprisoned not more than 1 year, or fined in the amount set forth in this title, or both, in any other case.[1]

---

[1]    Title 17, United States Code, § 506(a) Criminal Infringement, provides:

3

Title 18, United States Code, § 2320 states as follows:

(a)  Whoever intentionally traffics or attempts to traffic in goods or services and knowingly uses a counterfeit mark on or in connection with such goods or services shall, if an individual, be fined $2,000,000 or imprisoned not more than 10 years, or both, and if a person other than an individual, be fined not more than $5,000,000.  In the case of an offense by a person under this section that occurs after that person is convicted of another offense under this section, the person convicted, if an individual, shall be fined not more than $5,000,000 or imprisoned not more than 20 years, or both, and if other than an individual, shall be fined not more than $15,000,000.

**MONEY TRANSMITTING STATUTE**

7.   Title 18, United States Code, § 1960 states as follows:

(a) Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both.

(b)  As used in this section –

(1)  [T]he term "unlicensed money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree and –

(A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or felony under State law, whether or nor the defendant knew that the operation was required to be licensed or that the operation was so punishable.

--------

Any person who infringes a copyright willfully either- for purposes of commercial advantage or private financial gain, or by the reproduction or distribution, including by electronic means, during any 180-day period, of 1 or more copies or phonorecords or 1 or more copyrighted works, which have a total retail value of more than $1,000.

## **ITEMS TO BE SEIZED**

8.   The items to be seized are described as follows:

a.   All records, including but not limited to correspondence, telephone messages, electronic mail messages, memoranda, financial records, business records, or transaction records, to, from, concerning or relating to the following:

1.   Sekou Sillah, a.k.a. Sekou Sylla, or any variant thereof;

2.   Abraham Sillah;

3.   OAU International, or any variant thereof;

4.   Kotimex International, Inc., or any variant thereof;

5.   Ducor Express Travel, or any variant thereof;

6.   West Coast Trading, or any variant thereof;

7.   Zalkin, Inc., d/b/a Peerless Wiping Cloth, or any variant thereof.

b.   All books, records, correspondence, memorandum, faxes, e-mail messages, receipts, statements, files, agreements, notes, ledgers, and other documents relating to the transfer of money in any form to or from any person or business entity, and/or relating to the trafficking in counterfeit or pirated goods or services, including but not be limited to counterfeit or pirated compact discs (CDs), and Digital Video Discs (DVDs).

5

c.    All records pertaining to any negotiation or discussions regarding any financial transactions involving Sekou Sillah, Sekou Sylla, or any variant thereof, including but not limited to disbursements or cash outlays or receipts of funds made to or by Sekou Sillah, Sekou Sylla, or any variant thereof, including the identities involved in any way in those transactions.

d.    All records relating to international travel by Sekou Sillah, Sekou Sylla and any variant thereof.

e.    Any and all records and documents for any person or entity identified above at paragraph 8(a), including financial information, tax returns, and IRS filings, any work papers related thereto; bank statements, applications, deposit tickets, receipts, canceled checks, cashiers checks, money orders, wire transfer records, debit/credit memo, financial ledgers, journals, investment records real estate records, and other records of assets, correspondence, transmittals, and notes related to the alleged activity.

f.    All invoices, bills, receipts, expense reports, contracts, sales, visas, I-94 Entry/Exit cards, immigration documents, identification documents, passports, green cards, and safe deposit boxes relating to any person or entity identified above at paragraph 8(a).

g.    All directories, phone books, rolodex systems, address

6

books, and telephone listings, including palm pilots and other electronic devices used to store such information.

h.    All records and documents reflecting any relationship between any of these individuals or entities identified above at paragraph 8(a).

i.    Documents relating to any car rentals, including rental agreements in the name of any individual or entity identified above at paragraph 8(a).

j.    All computer and network equipment, peripherals and cables, servers, workstations, display screens, input devices, (including but not limited to keyboards, mice, and trackballs) printers, the software to operate them and related instruction manuals, found together or separately from one another, capable of being used to prepare or store the items listed in subparagraphs (a) through (i) above, including all the items listed below:

Any and all information and/or data stored in the form of magnetic, digital or electronic coding on computer media or on media capable of being read by a computer or with the aid of computer related equipment. This media includes but is not limited to removable hard disk cartridges and media drives, optical/CD ROM drives, tapes, laser disks, floppy diskettes, video, cassettes, fixed hard disks, and any other media which is capable of storing magnetic code.

Any and all electronic devises which are capable of analyzing, creating, displaying, converting, or transmitting electronic or magnetic computer impulses or data. These devices include but are not limited to computers, computer components, computer peripherals, word processing equipment, modems, monitors, printers, plotters, encryption circuit

7

boards, optical scanners, external hard drives and other
computer related electronic devices.

### FACTS

9.    During July and August 2002, the United States Postal
Inspection Service (USPIS) in Boston began an investigation of
Sekou Sillah for structuring the purchase of postal money orders.

10.    Also in 2002, postal money orders were purchased in the
name of Sekou Sillah on behalf of a company known as "OAU",
located at 1225 Broadway in New York City.  The payee listed on
many of these money orders was a company known as Kotimex
International, Inc., located in Griffin, Georgia.  In addition, a
number of postal money orders were purchased in the name of Sekou
Sillah, with the payee listed as West Coast Trading, also located
at 1225 Broadway in New York City.

11.    The investigation revealed that each of OAU, Kotimex
International, West Coast Trading, and Zalkin, Inc. d/b/a
Peerless Wiping Cloth, located in Council Bluffs, Iowa, received
large, even-dollar amount checks from an entity known as Ducor
Express Travel, with addresses listed at both 1586 and 1594
Columbus Avenue, Boston, Massachusetts.  Specifically, the
investigation revealed that between January 23, 2002 and April
19, 2002, Ducor Express Travel wrote five checks totaling
$46,734.45 to OAU.  All but one of the checks written to OAU were
in large, even-dollar amounts.  Between January 11, 2002 and
November 7, 2002, Ducor Express Travel wrote eight large, even-

8

dollar amount checks totaling $109,000.00 to Kotimex International.  Between November 19, 2002 and April 7, 2003, Ducor Express Travel wrote five large, even-dollar amount checks totaling $90,500.00 to West Coast Trading.  On January 25, 2003, Ducor Express Travel wrote a check in the amount of $12,000.00 to Zalkin, Inc. d/b/a Peerless Wiping Cloth.  The memo section on many of these checks stated "Sekou Sillah."  According to records obtained from the City of Boston Clerk's Office, Abraham Sillah is listed as the owner of Ducor Express Travel.  In addition, immigration records maintained by the Department of Homeland Security indicate that Abraham Sillah is the half-brother of Sekou Sillah.

12.  Ducor Express Travel's history of writing checks to these entities does not appear to have a legitimate business purpose.  None of the payee entities purports to be related to the travel industry.  For example, OAU purports to be engaged in wholesale distribution of electronics, and Kotimex International purports to be engaged in recycling and export of consumer goods (*i.e.*, shoes, clothing) to West Africa.

13.  On August 18, 2003, Sekou Sillah was arrested by the Massachusetts Bay Transit Authority Police for alleged counterfeit trademark violations of compact discs ("CDs") and

digital video discs ("DVDs").[2]

_____

[2]    Pursuant to the Recording Industry Association of America's ("RIAA") member standards, sound recording piracy involves one or more of the following forms of unauthorized duplication.  Unauthorized duplication includes duplication, distribution, and/or sale of pre-recorded sounds without the permission of the owner of the master recording and/or copyright. The term "piracy" is a general term describing all forms or unauthorized duplication.  It is divided into the three specific categories described below:

COUNTERFEIT: The unauthorized duplication of both the recorded sounds and the original artwork, trademark, and packaging of the original product;

PIRATE:  The unauthorized duplication of sounds without any attempt to duplicate the original artwork;

BOOTLEG:  The unauthorized recording and/or duplication of a live performance that is not legitimately available. Commonly, bootlegs are reproductions of concerts, or radio, TV, and cable broadcasts not intended for release.

Counterfeit CDs usually display the following characteristics:

Graphics on the paper labels or inserts are blurry. These recordings are often on CD recordable (CD-R) discs. RIAA member labels do not release their product on CD recordable media.

Inserts are not properly trimmed and/or the quality of the paper used is inferior to that used by the respective legitimate manufacturers.  Some or all of these CDs contain single sheet inserts with plain white backs lacking any print or graphics; legitimate product generally contains multi-page inserts or "booklets" with print and graphics on all sides.

Pirated CDs usually display the following characteristics:

a.  Virtually none of the recordings will have a picture of the artist or group, whereas, virtually all legitimate releases will have custom artwork featuring the artist or group.

14.  Pursuant to this arrest, 685 alleged counterfeit and

pirated CDs and DVDs, $1,822.80 in U.S. currency and checks, and

a receipt book were seized from Sekou Sillah.   The seized receipt

book indicates that approximately $5,000 was collected on that

day.  Analysis of the contents of the receipt book indicates that

Sekou Sillah may be acting as a money remitter.   It has been

determined through the Massachusetts State Banking Commission

that Sekou Sillah is not a licensed money remitter in the

Commonwealth of Massachusetts.   A phone number printed on the

individual receipts in the book, (212) 481-5332, is subscribed to

---

b.  Many recordings that do have pictures do not have
artwork that relates to the specific album.  The picture
may appear on recordings of another artist or company.

c.  Whereas legitimate companies will always display
their names, addresses, and trademarks or logos
prominently, many of the recordings will list unfamiliar
company names of alleged manufacturers or distributors,
list fictitious names and/or addresses, or list no names
and/or addresses at all.

d.  Many of the recordings contain false statements
regarding the payment of royalties or compliance with
copyright laws, whereas legitimate releases have no
need to so convince the consumer.

e.  Many of the recordings have packaging inferior in
quality when compared with the legitimate recordings.
Many have no artwork at all and simply have a
typewritten or crudely printed list of the performances
embodied within.

f.  Many of these recordings are on CD recordable media.
RIAA member companies do not release their legitimate
recordings on CD-R format.

11

by West Coast Trading.  A second phone number printed on the individual receipts in the book, (212) 213-0833, is subscribed to by an individual named Barry Abdulai.  Bank records indicate that Barry Abdulai is an employee of OAU.  A third phone number on the receipt is for a subscriber in Conakry, Guinea, West Africa.  It has been determined through the State of New York Banking Department that neither West Coast Trading nor OAU are licensed money remitters within the State of New York.  Below is a sample layout from receipts in the book seized from Sillah. (the agent signature lines contained signatures; they were, however, illegible):

SOGUICOFI

TEL: (212) 481-5332 (212) 213-0833

Centre Commercial Koumy
Boutique # R2 Cote BICIGUI
Tel: 224 46 55 93 / Fax: 224 46 31 19

| Date:  08/18/03 | | Receipt Number  BOS 08/18 | |
|---|---|---|---|
| Sender's Name | | Telephone No. | Address |
| ALPHA OUMOU BAH | | | |

| Beneficiary Name | Telephone No. | | Address | |
|---|---|---|---|---|
| FATOUMATA D. BAH | MAMADY DIARRA | | | |
| Amount in $US | Exchange Rate | Amount in G.F. | Flat Fees | Other Charges |
| 100 | | | 8 | |

Agent Signature:  _____      Date: <u>08-18-03</u>  _____

12

SOGUICOFI
TEL: (212) 481-5332 / (212) 213-0833

Centre Commercial Koumy
Boutique # R2 Cote BICIGUI
Tel: 224 46 55 93/Fax: 224 46 31 19

| Date: 08/18/03 | | Receipt Number | BOS 08/19 |
|---|---|---|---|
| **Sender's Name** | **Telephone No.** | | **Address** |
| BOUMTOURABY SAMOURA | | | |

| **Beneficiary Name** | **Telephone No.** | | **Address** |
|---|---|---|---|
| AMINATA CAMARA | | | |

| **Amount in $US** | **Exchange Rate** | **Amount in G.F.** | **Flat Fees** | **Other Charges** |
|---|---|---|---|---|
| 100 | | | 8 | |

Agent Signature: _____    Date: 08 - 18 - 03

SOGUICOFI
TEL: (212) 481-5332 / (212) 213-0833

Centre Commercial Koumy
Boutique # R2 Cote BICIGUI
Tel: 224 46 55 93/Fax:  224 46 31 19

| Date: 08/18/03 | | Receipt Number | BOS 08/20 |
|---|---|---|---|
| **Sender's Name** | **Telephone No.** | | **Address** |
| SAMOUSY KALLE | | | |

| **Beneficiary Name** | **Telephone No.** | | **Address** |
|---|---|---|---|
| DIAROU CHERIF | | | |

| **Amount in $US** | **Exchange Rate** | **Amount in G.F.** | **Flat Fees** | **Other Charges** |
|---|---|---|---|---|
| 400 | | | 32 | |

Agent Signature: _____    Date: 08-18-03

15.    On September 23, 2003, Andrea Powers, who at the time

was a consultant for the RIAA[3], examined the CDs seized from

---

[3]    The RIAA is a non-profit corporation that serves as a
trade association representing major sound recording companies
for approximately 90% of all phonorecords legitimately produced
each year in the United States.  RIAA member companies include:
EMI Recorded Music, North America, Sony Music Entertainment,
Inc., BMG Entertainment, Universal Music Group, and Warner Music
International.  The Anti-Piracy Unit of the RIAA was formed to
assist federal, state, and local law enforcement agencies by

Sekou Sillah.  Of the 685 CDs, Ms. Powers determined that 292 were counterfeit CDs bearing the trademarks: "Rocafella," "Capital," "J Records," and "Arista."  Ms. Powers determined that the remaining 393 CDs were pirated CDs.

16.  On August 21, 2003, Lawrence Frisoli, under contract with the Motion Picture Association of America ("MPAA"), examined 146 DVDs seized from Sekou SILLAH on August 18, 2003.[4]  Mr. Frisoli determined that these DVDs were illegal copies for the following reasons:

    1.    The cases were of inferior quality;

    2.    The images on the covers were dull and out of focus;

    3.    There were no bar codes on the rear of the covers;

    4.    The four corners of the covers were sharp and not curved;

---

providing expertise with respect to the sound recording industry and to assist in uncovering counterfeiting, pirating, and bootlegging problems which negatively impact the sound recording industry.

[4]    Mr. Frisoli has been contracted by the MPAA as a Field Investigator for the past six (6) years, investigating reports of pirated DVD and VHS movies in Massachusetts and New Hampshire. Mr. Frisoli is a retired FBI Special Agent with twenty-four years of service.  Mr. Frisoli received training in the detection of illegal DVD and VHS movie tapes in September 1999 in Atlantic City, New Jersey and in March 2002 at the MBTA Police Academy in Quincy, Massachusetts.  During the period from September 2002 to July 2003, Mr. Frisoli has testified regarding suspected pirated VHS tapes and DVDs on three occasions in Dorchester District Court, Dorchester, Massachusetts.

5.  There was no security tape on the side of the cases;

6.  There was no security device warning on the outside of the shells;

7.  The labels were of inferior quality;

8.  There was no promotional information inside the plastic cases;

9.  The DVD labels did not have the movie studio logo or movie name on it; and

10. Most of the DVDs had not yet been released to video.

17. Mr. Frisoli further found that, among the movies seized from Sekou Sillah on August 18, 2003, the following movies had not yet been released in DVD format as of the date of his examination:

1.  "Swat" by Columbia Studios

2.  "Gigli" by Columbia Studios

3.  "American Wedding" by Universal

4.  "Spy Kids 3-D" by Paramount

5.  "Freddy vs. Jason" by New Line Cinema

6.  "Bad Boys II" by Columbia

7.  "Terminator 3" by Warner Brothers

8.  "Laura Croft, Tomb Raider" by Paramount

9.  "Charlie's Angels" by Columbia

15

10.  "Junction Boys" by Buena Vista

11.  "Bruce Almighty" by Universal

18.  On January 7, 2004, a trash intercept was conducted at 50 Hartford Street, Dorchester, Massachusetts (hereinafter "50 Hartford Street"). Sekou Sillah's home is located at 50 Hartford Street, Apartment 2.[5] Investigators discovered a faxed page, written in French. The facsimile was transmitted from telephone number 212-685-2961. A business card for a company named Global Business Consortium in New York lists this number as it's fax number. The heading on this fax reads as follows:

**"VERSEMENT: (S. SYLLA) BOSTON**
**POUR LA PERIODE DU 11/1/2003 AU 12/5/2003"**

This translates in substance to "payment: S. Sylla, Boston for the period of 11/1/03 to 12/5/03." Directly below this header is a chart listing dates, names, amounts, and comments. The dates listed range from November 7, 2003 to December 1, 2003. The bottom of the chart lists the "total versement periode" (this

---

[5]    50 Hartford Street is a dwelling with two apartments. Investigators determined that from January 2004 through the first week of August 2004, both Apartment 1 and Apartment 2 were occupied. Although the evidence set forth herein links relevant documents to Sekou Sillah, during the January to early August 2004 period, it was not possible to determine from the intercept itself whether a specific bag of trash was produced from Apartment 1 or Apartment 2. Apartment 1 has been vacant since or or about August 6, 2004, and one of its residents had left the apartment as early as July 22, 2004. As set forth below, trash intercepts were made on August 18 and 25, September 1, 9, 22, and 29, October 6 and 27, 2004. The relevant trash received out of Apartment 2 was consistent with the relevant trash intercepted during the earlier period.

16

translates in substance to "total payment period") of $113,733.47

with a balance of $17,948.18.  Below is a layout of the

aforementioned facsimile:

### VERSEMENT: (S.SYLLA) BOSTON
### Pour la periode du 11/1/2003 au 12/5/2003

| Date | Gerant | Montant verse | Commentaires |
|---|---|---|---|
| 11/7/2003 | BARRY IBRAHIMA | 500.00 | PAYMENT DG-1101 |
| 11/10/2003 | BALDE ALIMOU | 41,071.00 | #263471 |
| 11/13/2003 | BALDE ALIMOU | 1,725.00 | CANC. BOS-11073 |
| 11/13/2003 | BALDE ALIMOU | 324.00 | CANC. BOS-10220 |
| 11/13/2003 | BALDE ALIMOU | 432.00 | CANCEL BOS-10221 |
| 11/14/2003 | BALDE ALIMOU | 432.00 | CANC. BF-11002 |
| 11/14/2003 | BARRY IBRAHIMA | -1,700.00 | PAID TO ADAMA TOURE ID#216 148 465 |
| 11/22/2003 | BALDE ALIMOU | 45,200.00 | #263500 |
| 11/28/2003 | BARRY IBRAHIMA | 11,500.00 | PAYMENT #263507 |
| 11/29/2003 | BALDE ALIMOU | 2,249.47 | COMM. NOV |
| 12/1/2003 | BARRY IBRAHIMA | 2,000.00 | DG-1134 |
| 12/1/2003 | BARRY IBRAHIMA | 10,000.00 | PAY #263513 |

Total versement Periode  $:   113,733.47
                Balance $:   17,948.18

A la date: 12/5/2003 Heure 5:26:39 PM.
        (The indication of the hour is not completely legible
        but is believed to read "5.")

    19.  Investigators also discovered several pieces of paper

with handwritten names and what appear to be transaction numbers

and amounts, consistent with money remitting.  A sample of the

numbers, names and figures handwritten on articles found in the

trash intercept are displayed below.  Due to the fact that these

are handwritten notes, the names were difficult to interpret:

| | | |
|---|---|---|
| 12024 | Alban Amada Ba | 300 |
| 12025 | C F Bintou Katta | 200 |
| 12027 | Mari Tejan Boaly Ymyrou | 100 |
| 12026 | Aramatu Kalloh | |
| | Aboup Bangoura | 600 |

17

20. On February 4, 2004, a trash intercept was conducted at 50 Hartford Street. Investigators discovered reconciliation sheets with columns for "date, transaction description, tras. amoun, trans int., Amt Rec. NY, Int. to Ducor, and Today Balance." These reconciliation sheets are consistent with money remitting and appear to have been faxed from a telephone number in New York. Handwritten notes on these sheets read "Sekou please send this am[oun]t," "if possible please send this amou[n]t to Kotimex. If not please sen[d] page 1 of first week." A typewritten note on one of these sheets reads "Please send this amount d[i]f[fer]ently in another envelop[e] $2,347.52."

21. A sample portion of the reconciliation sheets found during the trash intercept is displayed below:

Reconciliation Sheet[6]
July

| Date | Transaction Description | Tras. Amoun | Trans. Int | Amt Rec NY | Int to Ducor | Today Balance |
|---|---|---|---|---|---|---|
| 08/07/02 | BOS-8033 | 300.00 | 24.00 | | 7.92 | 10,133.47 |
| 08/07/02 | Cash for Abidjian | 500.00 | | | – | 10,633.47 |
| 08/08/02 | BOS-8034 | 600.00 | 48.00 | | 15.84 | 11,281.47 |
| 08/08/02 | BOS-8035 | 1,700.00 | 136.00 | | 44.88 | 13,117.47 |
| 08/08/02 | BOS-8036 | 200.00 | 16.00 | | 5.28 | 13,333.47 |
| 08/08/02 | BOS-8037 | 100.00 | 8.00 | | 2.64 | 13,441.47 |
| 08/08/02 | BOS-8038 | 100.00 | 8.00 | | 2.64 | 13,549.47 |
| 08/08/02 | BOS-8039 | 200.00 | 16.00 | | 5.28 | 13,765.47 |
| 08/08/02 | BOS-8040 | 100.00 | 8.00 | | 2.64 | 13,873.47 |
| 08/08/02 | BOS-8041 | 200.00 | 16.00 | | 5.28 | 14,089.47 |
| 08/08/02 | Sent to Kotimex Int'l | | | 16,000.00 | – | (1,910.53) |
| 08/08/02 | BOS-8042 | 800.00 | 64.00 | | 21.12 | (1,046.53) |

---

[6]    Although the header on the first of four reconciliation sheets reads "July," all the transactions appear to have occurred in August 2002. The twelve transactions depicted here were taken, in order, from approximately 150 such transactions.

An entry dated August 31, 2002 indicates that another $15,000.00 was transferred to Kotimex on that day.  On the same day, there is an entry indicating that $1,232.00 was "Interest to Sekou."

22.  Investigators also discovered a sheet of paper bearing two receipts similar to those receipts seized from Sekou Sillah as a result of his August 18, 2003 arrest.  An example of these receipts are detailed below (again, the signature line contained signatures; however, they were illegible):

From: Guinea International Inc
      1225 Broadway Room 808
      New York, NY 10001
      Tel:  212-213-0833
      Fax: 212-213-2330

BARRY & BROTHERS
Centre Commercial Koumy
Dixinn Gare, Boutique # R2
A Cote de la Nouvelle Agence de BICIGUI
Tel: 224-46-55-93    Fax: 224-46-31-19

| Date:   ___/___/___ | | Receipt Number  BOS 7001 | |
|---|---|---|---|
| Sender's Name | Telephone No. | | Address |
| BEN FOFANNA | | | |

| Beneficiary Name | Telephone No. | | Address |
|---|---|---|---|
| SEKOU CAMARO FOFANNA | | | |
| Amount in $US | Exchange Rate | Amount in G.F. | Flat Fees | Other Charges |
| 2400 | --------- | --------- | 90 | -------------- |

Agent Signature:  (SIGNATURE)        Date: 7/10/001

From: Guinea International Inc
      1225 Broadway Room 808
      New York, NY 10001
      Tel:  212-213-0833
      Fax: 212-213-2330

BARRY & BROTHERS
Centre Commercial Koumy
Dixinn Gare, Boutique # R2
A Cote de la Nouvelle Agence de BICIGUI
Tel: 224-46-55-93    Fax: 224-46-31-19

| Date:   ___/___/___ | | Receipt Number:   OAU - 6096 | |
|---|---|---|---|
| Sender's Name | Telephone No. | | Address |
| SEKOU SYLLA | | | 617-442-7932 |

| Beneficiary Name | Telephone No. | | Address |
|---|---|---|---|
| SEKOU OUMAR FOFANNE | | | |
| Amount in $US | Exchange Rate | Amount in G.F. | Flat Fees | Other Charges |
| 3400 | --------- | --------- | 100 | -------------- |

Agent Signature: (SIGNATURE)    Date: 6/16/01

19

23.  Investigators also discovered spreadsheets, both handwritten and typewritten, listing consecutive receipt numbers with names, amounts and fees for January 3 & 20, 2004.  The typewritten sheet has the name "S. Sylla-Boston" on the top, along with the amounts $20,700 and $1,590 in fees for one day.  These spreadsheets are consistent with money remitting.  A sample of each spreadsheet discovered follows:

*REPRESENTANT: (S. SYLLA)  BOSTON*
Pour la periode du 1/3/2004  au 1/3/2004

| Date | position | Expediteur | Destinataire | M T $ | Fees |
|------|----------|------------|--------------|-------|------|
| **Fax: 129** | | | | 20,700.00 | 1,590.00 |
| CONAKRY | | | | 20,600.00 | 1,580.00 |
| 03-Jan-04 | BOS-01001 | BANGALI CAMARA | MAMADY KOUYATE | 300.00 | 24.00 |
| 03-Jan-04 | BOS-01002 | AISATOU TUTU SHERIF | HADJA HAFISATU SHERIF | 300.00 | 24.00 |
| 03-Jan-04 | BOS-01014 | AISHA KABA | KEFIN KABA | 200.00 | 16.00 |
| 03-Jan-04 | BOS-01015 | BINTA BOOM | GUITA BOOM | 50.00 | 8.00 |
| 03-Jan-04 | BOS-01016 | BINTA BOOM | AMADOU BOOM | 200.00 | 16.00 |
| 03-Jan-04 | BOS-01026 | ABDULAYE SYLLA | EL-AMADOU S LY | 10,000.00 | 700.00 |
| 03-Jan-04 | BOS-01027 | NATOMA SANO | ALHOUSENE SHERIF | 2000.00 | 160.00 |
| 03-Jan-04 | BOS-01028 | MOHAMED TRAORE | ADAMA SACKO | 50.00 | 8.00 |

And (handwritten)

| | | | | | |
|------|------|------|------|------|------|
| 01-20-04 | **BOS** 01171 | KADIATOU DIALLO | AISSATOU DIALLO | 500 | 40 |
| | **BOS** 01172 | FATOUMATA DIALLO | AISSATA BAH | 100 | 8 |
| | **BOS** 01173 | HAWA BARRY | KADIATOU BARRY | 300 | 24 |
| | **BOS** 01174 | | | | 32 |
| | **BOS** 01175 | ADAMA FALL | MARY FALL | 100 | 8 |
| | **BOS** 01176 | | | | |
| | **BOS** 01177 | | | | |
| | **BOS** 01178 | | | | |
| | **BOS** 01179 | | | | |
| | **BOS** | | | | |

Agent Signature: _____(Signature illegible))_____  Date: 01/20/2004

20

24.    In addition, investigators discovered several notes and receipts with names and amounts, also consistent with money remitting.  The address on at least two of these receipts is for a company at 1225 Broadway, Room 808, New York, NY. Investigators also discovered a business card for OAU International, 1225 Broadway, Room 801, New York, New York. Investigators also discovered a page printed from Yahoo mail for the screen name sillah44@yahoo.com.  This document, dated April 22, 2002, lists reference numbers, amounts (totaling $16,650) and interest (totaling $1,216).  Investigators also discovered two pages from a spiral notebook listing inventory of CDs with prices and dates.

25.    On February 19, 2004, a trash intercept was conducted at 50 Hartford Street.  Investigators found two handwritten pages containing reference numbers, names and amounts, indicating money remitting.

26.    On March 10, 2004, a trash intercept was conducted at 50 Hartford Street.  Investigators discovered numerous notes with names and amounts, consistent with money remitting.

27.    On March 24, 2004, a trash intercept was conducted at 50 Hartford Street.  Investigators discovered numerous notes with names and dollar amounts, consistent with money remitting. Investigators also discovered six pirated CD-Rs for the following: "Traded All, Part II by DJ Envy," "Hood Legends, Part

21

IX," " Big Mike Strikes Again," "DJ Booms Thirst, Part III," and
two copies of "DJ Envy, Back to School." Examination of each CD-
R by James Flynn, Investigative Consultant for the RIAA has
determined them to be pirated.[7] According to Mr. Flynn, these
pirated CDs are compilations of different artists and the
individual songs are commercially available.

28. Investigators also discovered one empty plastic CD
jewel case for the album "The Best of Sean Paul." This item was
examined by Mr. Flynn, who determined that the insert was
inferior in quality to a legitimate music insert. The insert
appears to be a folded sheet of paper created by means of photo
duplication.

29. On April 28, 2004, a trash intercept was conducted at
50 Hartford Street. Investigators discovered approximately 44
spiral notebook pages listing dates, item descriptions, number of
items sold, unit price and sub total. The items include CDs,
watches, leather jackets, hats, and pocketbooks. The dates

---

[7]    James Flynn is employed as an Investigator for Anti-
Piracy Operations for the RIAA. He has been so employed by the
RIAA on a per diem basis since July 2003. Mr. Flynn has received
training from the RIAA's legal staff and from Regional
Investigators in Yonkers, New York. This training has included
reviews of pertinent federal and state statutes; tape and disc
manufacturing process; printing, packaging, and fabrication
process; and techniques for identification of unauthorized sound
recordings. Prior to joining the RIAA, Mr. Flynn was employed by
the Bergen County, New Jersey Prosecutor's Office for 27 years,
retiring as a Detective Sergeant. Prior to that, Mr. Flynn was a
police officer with the Englewood Cliffs, New Jersey Police
Department for six years.

listed on these spiral notebook pages range from October 5, 1999, through April 8, 2000.

30. For approximately the past five years, Sekou Sillah has rented automobiles from the Dollar/Thrifty Automotive Group ("Thrifty") location servicing Boston Logan International Airport. That Thrifty outlet is located at 40 Lee Burbank Highway, Revere, Massachusetts. Thrifty's frequent rental program is known as "Blue Chip". Sekou Sillah is a "Blue Chip" member. The investigation has revealed that between January 2003 and early July 2004, Sekou Sillah rented vehicles from Thrifty at the Revere location on at least fifty (50) occasions. On May 6, 2004, an Order was issued by this Court (Dein, M.J.) relating to this investigation. Pursuant to that Court Order, an electronic tracking device was attached to a Thrifty rental vehicle prior to the vehicle being rented by Sekou Sillah on May 14, 2004 at approximately 3:45 a.m. On May 14, 2004 at approximately 10:30 p.m., the Massachusetts State Police conducted a traffic stop (for speeding) on the Thrifty rental vehicle Sekou Sillah was driving as he returned to Massachusetts from New York. The Massachusetts State Police conducted a consent search of the trunk of the vehicle. During the search of the trunk, a State Trooper discovered numerous alleged counterfeit CDs/DVDs. The State Trooper subsequently arrested Sekou Sillah and seized the merchandise. On May 17, 2004, Sekou Sillah appeared in the

23

Dudley District Court on charges that he violated M.G.L. ch. 266,

§ 143A (Unauthorized reproduction and transfer of sound

recordings), and M.G.L. ch. 266, § 143C (Manufacture, rental or

sale of recorded devices in packaging not bearing reproducer's

name and address).

31.  On May 26, 2004, a trash intercept was conducted at 50

Hartford Street.  Investigators discovered a document, written in

French, with the following heading:

"Versement: (S. Sylla) Boston-Pour la periode du 4/1/2004 au
5/4/2004"

This translates in substance to "payment: S. Sylla, Boston for

the period of 4/1/2004 to 5/4/2004."  Directly below this header

is a chart listing dates, names, amounts, and comments.  The

dates listed range from April 5, 2004 to April 30, 2004.  The

bottom of the chart lists the "Total versement periode" (this

translates in substance to "total payment period") of $80,745.24

with a balance of $40,940.86.  Below is a layout of the

aforementioned document written in French Some amounts on the

document were not completely legible:

**VERSEMENT: (S.SYLLA) BOSTON**
**Pour la periode du 4/1/2004 au 5/4/2004**

| Date | Gerant | Montant verse | Commentaires |
|------|--------|---------------|--------------|
| 4/5/2004 | BALDE ALIMOU | 1,080.00 | #475046 |
| 4/5/2004 | BALDE ALIMOU | 15,920.00 | #475043 |
| 4/6/2004 | BAH HABIB | 185.00 | CANC. BF-02007 |
| 4/10/2004 | BALDE ALIMOU | 330.00 | BF-04005 |
| 4/12/2004 | BARRY IBRAHIMA | 23,000.00 | PAY #475069 |
| 4/17/2004 | BARRY IBRAHIMA | 600.00 | PAY #475086 |
| 4/22/2004 | BALDE ALIMOU | 33,700.00 | #475099 |
| 4/23/2004 | BALDE ALIMOU | 1,800.00 | #475103 |
| 4/23/2004 | BALDE ALIMOU | 200.00 | CK-427 |
| 4/28/2004 | BALDE ALIMOU | 165.00 | #475116 |
| 4/29/2004 | BALDE ALIMOU | 1,512.00 | #475108 |
| 4/30/2004 | BALDE ALIMOU | 2,253.24 | COMM. AVRIL |

**Total versement Periode  $: 80,745.24**
**Balance  $: 40,940.86**
**A la date: 5/4/2004 Heure 6:15:00 PM**

32.  Investigators also discovered a spreadsheet listing
receipt numbers, names, amounts, and fees for May 12, 2004, as
well as several pieces of paper with handwritten names, numbers,
and amounts, consistent with money remitting.

33.  Investigators also discovered three DVDs: "Lara Croft,
Tomb Raider,"  "Bad Boys II-One Love," and an unlabeled DVD.
These items were examined by Larry Frisoli, Field Investigator
for the MPAA, who determined these DVDs to be pirated due to the
lack of graphics and studio logo on the label of the DVDs, and
the purple color of the back-side of the DVDs.

34.  On June 16, 2004, a trash intercept was conducted at 50
Hartford Street.  Investigators discovered a spreadsheet listing
receipt numbers, names, amounts, and fees for June 1, 2004, as
well as several pieces of paper with handwritten names, numbers
and amounts, consistent with money remitting.

35.  Investigators also discovered one DVD, with cover,

25

called "Home on the Range" by Disney.  According to Mr. Frisoli,
this DVD was determined to be pirated due to the lack of graphics
and studio logo on the label of the DVD, and the purple color of
the back-side of the DVD.  In addition, the plastic DVD jewel
case contained no advertising information on the inside, and the
corners of the cover label were sharp and not curved, both
indicating a pirated product.

36.  On June 23, 2004, a trash intercept was conducted at 50
Hartford Street.  Investigators discovered two spreadsheets
listing receipt numbers, names, amounts, and fees for June 10 &
17, 2004, as well as a piece of paper with handwritten names,
numbers and amounts, consistent with money remitting.

37.  On June 30, 2004, a trash intercept was conducted at 50
Hartford Street.  Investigators discovered a spreadsheet listing
receipt numbers, names, amounts and fees for a date in June 2004.
The date is illegible.  Investigators also discovered two CDs
with covers for "Lil Jon & the East Side Boyz" by Ichiban Records
and "Floetry Floacism Live."  James Flynn, Investigative
Consultant for the RIAA, examined these CDs and determined them
to be pirated, due to the packaging being inferior in quality
when compared with legitimate recordings.  In addition, these
recordings are on CD-R media.  RIAA member companies do not
release their legitimate recordings on CD-R format.

38.  On August 18, 2004, a trash intercept was conducted at

50 Hartford Street.  Investigators discovered several handwritten notes in the form of a spreadsheet, listing receipt numbers, names, amounts, and fees.  Investigators discovered nine plastic DVD jewel cases for the following movies: "Lara Croft, Tomb Raider" by Paramount, "Training Day" by Warner Brothers, "Van Helsing" by Universal, "Pay Check" by Paramount, "Hell Boy" by Columbia, "Tool Box Murders," "Never Die Alone (DMY)" by Fox Searchlight Pictures, "Love Don't Cost a Thing" by Warner Brothers, and "Tuareg-The Desert Warrior" by West Lake Entertainment Group.  Larry Frisoli, Field Investigator for the MPAA, determined all of these plastic DVD jewel cases to be pirated product, due to a lack of advertising information on the inside, and the corners of the cover label being sharp and not curved.  Mr. Frisoli advised that the movie "Van Helsing" had not yet been released to DVD.  Investigators also discovered four plastic compact disc jewel cases, all of which were empty.  The jewel cases were for the following: "Regae Gold 2003-With Various Artists" by Atlantic Record Corporation, "Cut Master C-Hotter than the Weather, Part II," "Clinton Sparks Presents Get Familiar-Volume VI," and "Rough Riders Present Jae Hood."  James Flynn, Investigative Consultant for the RIAA, examined each jewel case and determined them to be of inferior quality due to the label inserts inside the jewel cases being of inferior quality in comparison to what originals would be.  In addition, the graphics

27

on the inserts are blurry, and are not properly trimmed, and the quality of the paper used is inferior to that used by legitimate manufacturers.

39.  On August 25, 2004, a trash intercept was conducted at 50 Hartford St. Dorchester, Massachusetts.  Investigators found two pages containing reference numbers, names, and amounts consistent with money remitting.  A sample of the handwritten page is detailed below (due to the fact that the document was handwritten; it is difficult to interpret the names and amounts):

| 08110 | BINTA BARRY | EL SADO | 50 | 8 |
| 08111 | BINTA BARRY | SALAMATA BARRY | 150 | 8 |
| 08112 | BINTA BAH | T. ABDOUL BAH | 200 | 16 |
| 08113 | FATOUMATA DIALLO | AISSATA BAH BAH | 250 | 24 |
| 08114 | MAMADOU ALPHA BAH | SOULEMANE BAH | 150 | 16 |
| 08115 | GASTON SYLLA | FOULEMATOU SOUMAH | 800 | 64 |

40. On September 1, 2004, a trash intercept was conducted at 50 Hartford St. Dorchester, MA.   Investigators discovered an alleged counterfeit plastic CD jewel case, "Who is Jill Scott"? James Flynn, Investigator for the RIAA, examined this CD jewel case and determined it to be a copy of the original CD insert graphics.  According to Mr. Flynn, the inserts were on single sheets of paper, were blurry, and were not properly trimmed.  The paper used was of inferior quality to that used by legitimate manufacturers.  When compared to the legitimate CD by Jill Scott, the inserts are in booklet form, not single sheets of paper. This jewel case would be the type that is commonly used for packaging illegal CDs, such as a counterfeit CD.

41.  On September 9, 2004, a trash intercept was conducted at 50 Hartford St. Dorchester, Massachusetts.  Investigators discovered handwritten documents containing reference numbers, names, and amounts, consistent with money remittance ledgers.  A sample of the handwritten pages is detailed below (due to the fact that the ledgers were handwritten, it was difficult to interpret the names and amounts):

| 09036 | Soulemane Bah | Bah Ibrahima | 500 | 40 |
| 09037 | El Mohamed Bah | Fatoumata Bah | 100 | 8 |
| 09038 | Fatou Barry | Mamadou K. Barry | 100 | 8 |
| 09039 | Mama Cisse | Mohamed Cisse | 300 | 24 |
| 09040 | Sekou Camara | Momokie M. Camara | 50 | 8 |

42.  On September 22, 2004, a trash intercept was conducted at 50 Hartford St. Dorchester, Massachusetts.  Investigators discovered a piece of paper with handwritten names and amounts consistent with money remittance.  An example of the handwritten notations is detailed below. (due to the fact that the document was handwritten, it was difficult to interpret the names):

| 09130 | Mohamed Doumbouya | Aboubacar Doumbouya | 200 | |
| 09131 | Alpha Camara | Sekou Camara | | |

43.  On September 29, 2004, a trash intercept was conducted at 50 Hartford St. Dorchester, Massachusetts.  Investigators discovered an alleged counterfeit plastic CD jewel case, "DJ Clue Roca Wear Mix Tape Vlo. [sic] 1".  James Flynn, Investigator for the RIAA, examined this CD jewel case.  According to Mr. Flynn, this jewel case had two inserts marked DJ Clue Roca Wear Mix Tape Vlo. [sic] 1 with the artists of Fabulous, Jay Z , JaRule ect…

The label inserts were of inferior quality to what the original would be.  The graphics on the inserts were blurry and not properly trimmed.  This would be consistent with a pirated CD had this jewel case contained a CD.  The paper used was of inferior quality to that used by legitimate manufacturers.  Examination of this jewel case indicates that it is the type that is commonly used for packaging illegal CDs.

44.  On October 6, 2004, a trash intercept was conducted at 50 Hartford St. Dorchester, Massachusetts.  Investigators discovered handwritten documents containing reference numbers, names, and amounts, consistent with money remittance ledgers.  A sample of the handwritten ledgers is detailed below. (due to the fact that the ledgers were handwritten, it was difficult to interpret the names):

| 09274 | Matoma Sano | Ghalen Soure | 3000 | 240 |
| 09275 | Foulematou Camara | Ibrahima Camara | 1000 | 80 |
| 09276 | Ibrahima Barry | Aisata Bah | 700 | 56 |
| 09277 | Ganrake Balde | Mamadou A. Balde | 300 | 24 |
| 09278 | Habib Thiam | Mamadou J. Thiam | 500 | 40 |

45.  On October 27, 2004, a trash intercept was conducted at 50 Hartford St. Dorchester, Massachusetts.  Investigators discovered handwritten notes containing reference numbers, names, and amounts, consistent with money remitting.  Several of these pages are torn apart, making an exact recreation of the notes difficult, but they are consistent with the earlier handwritten notes described above.

46. Based upon my training and experience, I have learned that both counterfeit goods traffickers and unlicensed money remitters keep records, documents, and ledgers showing dates, names, and amounts paid for counterfeit goods or for money unlawfully remitted, and United States currency which is proceeds of those criminal activities.

47. Based on the foregoing information, I believe probable cause exists to believe that Sekou Sillah, a/k/a Sekou Sylla, has committed violations of 18 U.S.C. §§ 2319, 2320 and 1960.

48. I also believe there exists probable cause that property constituting evidence of the commission of criminal activity, contraband, the fruits of crimes, and property intended for use in committing criminal offenses, including but not limited to records and documents showing dates, names, and amounts paid in unlicensed money remitting transactions and for counterfeit and pirated CDs and DVDs, United States currency, and other relevant documents set forth as the Items To Be Seized, are maintained in and on the premises at 50 Hartford Street, Dorchester, Massachusetts, Apr. 2, Dorchester, Massachusetts, as described in this affidavit.

### NECESSITY OF OFFSITE SEARCH OF COMPUTERS

49. During the course of this and other investigations, I have consulted with computer forensic specialists within Immigration and Customs Enforcement as well as the former United

States Customs Service.  From my training and experience, I am aware that the proper retrieval and analysis of all electronically stored (computer) data, the documentation and authentication of such data, and the prevention of the loss of the data either from accidental or deliberate programmed destruction, requires on-site and laboratory analysis by a qualified computer specialist.  To effect such accuracy and completeness requires the seizure of all computer equipment and peripherals, which may be interdependent, the software to operate the computer system, and related instruction manuals which contain directions concerning the operation of the computer system, and the software programs.

50.  I am aware that computer storage devices, such as hard disks, diskettes, tapes, and compact disks, can store the equivalent of thousands of pages of information.  As an example, a one hundred megabyte (100MB) hard drive would have the capacity for storing approximately 50,000 pages of typewritten, double-spaced text, however, I have also been advised that the majority of computers currently sold have as a minimum, twenty gigabyte (20000MB) hard drives, or larger, with an equivalent capacity in excess of 10 billion pages of typewritten, double-spaced text.

51.  Based upon information I have received from computer specialists, when a user wants to conceal criminal evidence, he/she often stores it in random order with deceptive file names.

This requires the agents conducting the search to examine all the stored data to determine which particular files are relevant and fall within the scope of the warrant.  This search process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on-site.

52.  With respect to this latter part of the search, the analysis of electronically stored data, whether performed on-site or in a laboratory or other controlled environment, may entail any or all of several different techniques.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer capable of containing pertinent files, in order to locate the evidence and instrumentalities authorized for seizure by the warrant); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; or performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

33

53.  Upon information and belief, searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment, and that data search protocols are exacting procedures designed to protect the integrity of the evidence, and to recover even "hidden", erased, compressed, password protected, or encrypted files.  I understand that many commercial computer software programs also save data in unique formats which are not conducive to standard data searches. For instance, some programs create temporary "print files" for the generation of hard-copy printouts then automatically deletes them after a time set by the computer user; the remaining data is then compressed into a format that is not viewable with standard utility software programs.

54.  Since computer evidence is extremely vulnerable to tampering or destruction (both from external sources or from destructive codes imbedded in the system as a "booby trap"), a controlled environment is essential to a complete and accurate analysis.  In order to fully retrieve data from a computer system, the analyst needs to seize all magnetic storage devices, as well as the centralized processing units (CPU's) in order to search them in a laboratory or controlled environment.

55.  To the extent practical, if persons claiming an interest in any seized computer so request, I will make available to those individuals "bit by bit" or "cloned" copies of the

34

computer(s) hard-drives within a reasonable time after the execution of the search warrant to minimize any impact that said seizures may have on their personal and/or business operations. If after inspecting the computer system, including all input-output devices, system software, and instruction manuals, a computer specialist determines that these items are no longer necessary to retrieve and preserve the data evidence, I will return them as soon as practicable.

_____

REBECCA S. FALLON
Senior Special Agent
Immigration and Customs Enforcement


Subscribed and sworn to before me this 2/th day of October 2004 at Boston, Massachusetts.

_____

LAWRENCE P. COHEN
U.S. Magistrate Judge

35